DECISION
Plaintiff Raymond LaBelle ("LaBelle") seeks a money judgment from Defendant Malry L.P. d/b/a the Hi-Hat ("the Hi-Hat") for breach of contract. The Hi-Hat defends this action on grounds of failure of consideration, unclean hands, and payment. The Defendant has also filed a three count counterclaim — breach of contract, misrepresentation, and unjust enrichment — for which it seeks compensatory damages, consequential damages, attorney's fees, interest, and costs. Jurisdiction is pursuant to G.L. 1956 §§ 8-2-13 and 8-2-14.
 `Travel of the Case
This Court, sitting without a jury, heard this breach of contract action. LaBelle, Larry Friedlander ("Friedlander"), the general partner of the Hi-Hat, and an expert witness retained by the Hi-Hat provided testimony.
The Hi-Hat, by and through its general partner, Friedlander, and LaBelle entered into a contract for the exchange of the performance of services for money.[1] Specifically, LaBelle, who owns and operates PC Pro Systems, agreed to design and install a point-of-sale ("POS") computer network system to outfit Friedlander's new entertainment venue, the Hi-Hat, for *Page 2 
business operations. In return, Friedlander agreed to compensate LaBelle for his services by remitting payment of approximately $38,000. Although each side had his or its own version of events, the parties agreed on the terms of the oral contract.
LaBelle installed the computer system in September of 2003, just after the Hi-Hat's grand opening on Labor Day weekend. Friedlander made a down payment of $17,000, with payment in full to be made upon completion of the performance. However, Friedlander failed to pay the full balance on the contract. Soon thereafter, the computer system began to experience regular failures, and LaBelle refused to service the system until he was paid in full.
Sometime during the end of September and early October, Friedlander maintains, he informed LaBelle that he could not afford to pay him in one lump sum as promised. Friedlander testified that he spent 33% over budget for the opening of the Hi-Hat and had outstanding bills with a number of vendors. To cope with the situation, Friedlander reasons, he made small payments, as he could afford, to each of the vendors, including Labelle. Specifically, Friedlander testified that after his initial $17,000 payment, he sent payments, generally in $1000 increments, to Labelle every couple of weeks. Enclosed with each payment was a note indicating that more payments would be forthcoming.
Soon after its installation, the computer system began to malfunction periodically. From October to December 2003, LaBelle serviced the system and accepted the small payments made by the Defendant. LaBelle even included finance charges on each of the four invoices to account for the Defendant's overdue payment. By the end of December 2003, however, LaBelle sent Friedlander a letter demanding immediate payment on the balance of the contract and he further refused to continue servicing the system until he received payment. In January of 2004, the POS software system was malfunctioning, which Friedlander claims *Page 3 
slowed down the entire operation of the restaurant, and LaBelle still refused to assist. LaBelle admits that he spoke to the company which had manufactured the software he used for the Hi-Hat's system and advised it that Friedlander had not paid him for his work. As a result, the software company refused to provide technical support to the Hi-Hat, and Friedlander hired Fred Medeiros of Ocean State Business Solutions, Inc. ("Ocean State") to repair the system. In response to LaBelle's actions, Friedlander stopped making payments on the contract in mid-2004. By that time, Labelle had received approximately $10,500 in payments from Friedlander, in addition to the $17,000 down payment, for a total of $30,500 on the approximately $38,000 contract not including finance charges.
At trial, Friedlander called Mr. Medeiros to testify regarding his repair work to the POS system. Mr. Medeiros' sixteen years of experience in the field of computer hardware technology and his last twelve years as the owner of Ocean State qualified him to testify. Based on his extensive repair work to the system, Mr. Medeiros was of the opinion that Plaintiff had not used quality brand hardware to outfit the system. He attributed the frequent failures to the inferior quality components of the system, in particular, the motherboard and the driver.
Regarding the cost of repairs, Mr. Medeiros explained that some of the faulty equipment was replaced altogether, despite the fact that it was under warranty, because Plaintiff refused to assist with the warranties registered in his name. Plaintiff likewise failed to release the access codes for the computer system. As such, the repairs were further delayed when Mr. Medeiros was unable to bypass a security system installed by Plaintiff. Mr. Medeiros explained that he recommended that Mr. Friedlander hire another company, POS Technologies, Inc., to handle the POS software system, since it is an area beyond his expertise. Friedlander *Page 4 
and Mr. Medeiros both testified concerning the unusual breakdown of five out of the eleven hard drives, as well as the system hub, in less than eight months after installation, all of which ultimately had to be replaced.
LaBelle refuted Mr. Medeiros' testimony by noting that the system he installed is still in operation today, over three and one-half years later. Moreover, LaBelle points out that Mr. Medeiros has never installed a POS system in his business; therefore, he cannot accurately assess the system's quality. LaBelle also testified that he warned Friedlander and the general manager to provide ventilation for the system components — the hard drives located in cabinets — which ultimately overheated and crashed.
To date, the Hi-Hat has paid $30,500 to Plaintiff. The balance of $7434.36 remains outstanding. Plaintiff contends that $7434.36 is owed on the contract; however, he seeks $9416.52, which includes $1982.16 in finance charges for nonpayment. Friedlander provided the Court with the invoices from Mr. Medeiros' company, Ocean State Business Solutions, and the software company, POS Technologies, Inc. Friedlander submits and the invoices reflect that the Hi-Hat paid and/or owes $9505.12 to Ocean State Business Solutions and POS Technologies, Inc. for repairs to the POS computer system originally installed by LaBelle.
 Standard of Review
In a non-jury trial, the trial justice acts as the trier of fact and law. Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). The trial justice balances and considers the evidence, determines the credibility of the witnesses, and draws appropriate inferences. Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Walton v. Baird,433 A.2d 963, 964 (R.I. 1981). It is, after all, "the judicial officer who actually observe[s] the human drama that is part and parcel of every trial *Page 5 
and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of the Dissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006).
 Analysis
The parties agree that they entered into an oral contract, pursuant to which services were to be performed in exchange for monetary consideration. "`A contract is an agreement which creates an obligation. Its essentials are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.'"Lamoureux v. Burrillville Racing Ass'n., 91 R.I. 94, 98, 161 A.2d 213,215 (R.I. 1960) (quoting 17 C.J.S. Contracts § 1 at 310). Because the instant contract called for Plaintiff to install a POS system that could be and was completed within the span of one year, the contract for services does not fall within the statute of frauds and is enforceable without a writing. See R.I. Gen. Laws § 9-1-4. Accordingly, said contract is a legally binding agreement, replete with consideration on both sides.
 A. Varying of Payment Terms
With respect to this agreement, Plaintiff asserts that Defendant breached the contract by failing to remit full payment upon completion of performance. Citing the financial woes associated with the opening of a business, the Defendant admits that it was unable to tender the balance in accordance with the contract terms. Mr. Friedlander testified that he paid almost half of the contract price in his down payment, and continued to make installment payments of $1000, up to the point where Plaintiff ceased to continue servicing the system, and the software company refused to provide technical support based on comments made by the Plaintiff. *Page 6 
"Where one furnishes services under a contract at the request of another and with the expectation that he will be paid for his services[,] he is entitled to payment in accordance with the terms of the contract." First Hartford Realty Corp. v. Ellis, 181 Conn. 25, 36
(Conn. 1980). In fact, as a general rule "[i]t is a material breach of a contract to fail to pay any substantial amount of the consideration owing under the contract" Williston on Contracts, Vol. 23 § 63:16 (4th ed. 2000); see generally Iannuccillo v. MaterialSand and Stone Corp., 713 A.2d 1234, 1239-1240 (R.I. 1998) (In a construction contract context, "the failure of a party to pay installment payments on a construction contract is a material breach of the contract and excuses further performance by the nonbreaching party.") Extenuating circumstances, however, may preclude the application of this rule. For example, the parties' failure to strictly enforce the terms of the contract during the course of performance prohibits either party from maintaining an action for breach for lack of compliance with those terms. 17A Am Jur. 2D CONTRACTS § 635.
Friedlander maintains that he sent partial payments to Plaintiff — as evidenced by the notes he sent with each payment indicating that more payments were forthcoming — with the hopes that Plaintiff would give the Hi-Hat an extension of time due to its precarious financial situation. Friedlander reasonably believed he reached an understanding with Plaintiff as his payments were negotiated, Plaintiff continued to provide technical support, and Plaintiff and his wife ate and drank at the Hi-Hat free of charge.
Our Supreme Court has previously held that a party to a contract may waive his or her right to enforce the payment terms on a contract by accepting an alternate payment method, although the entire amount remains due. See Mackenzie v. Desautels, 62 R.I. 135, 3 A.2d 660 (1939) (plaintiff allowed the defendants to make "reasonable efforts" to pay the monthly *Page 7 
payments on a note, thereby, waiving her right to enforce the payment terms). The Mackenzie Court acknowledged that "[t]here is merely the averment of a promise by the plaintiff to waive the payment of the note according to its tenor, if the defendants would make a reasonable effort to pay the interest and monthly installments in such sums and manner as their circumstances would permit, and no averment of any corresponding new promise on the part of the defendants which would be any detriment to them." Id. at 140, 3 A.2d at 663.
Although here there was no averment of a promise by plaintiff to forego the payment terms, Plaintiff, in fact, impliedly waived his right to enforce the payment terms by accepting the Defendant's $1000 payments. "An implied waiver exists when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct that misleads one of the parties into a reasonable belief that a provision of the contract has been waived." 17A Am Jur. 2D CONTRACTS § 636. Plaintiff accepted the modified payment arrangement, as indicated by his negotiation of the payment checks and continued technical support on the system from October to December 2003. Additionally, Plaintiff unilaterally applied interest charges to the Defendant's account. Here, Plaintiff "`pursued such a course of conduct as to sufficiently evidence an intention to waive a right.'" Sturbridge Home Builders, Inc. v.Downing Seaport, Inc., 890 A.2d 58, 65 (R.I. 2005) (quoting Ryder v.Bank of Hickory Hills, 146 Ill. 2d 98, 585 N.E.2d 46, 49 (Ill. 1991));see also 17A Am Jur. 2D CONTRACTS § 636 ("An unexplained delay in enforcing a contract may constitute evidence of waiver and acquiescence in the manner of the other party's performance.") By repeatedly accepting the Defendant's payments instead of filing a cause of action within a reasonable time after he was informed that the Defendant could not pay for the *Page 8 
services in accordance with the contract terms, Plaintiff waived his right to demand the full balance according to the contract terms.
Insofar as the Defendant breached the contract by deviating from the payment terms, "[a] contracting party who, with knowledge of a breach by the other party, receives money in the performance of the contract, waives the breach." 17A Am Jur 2D CONTRACTS § 639. As such, the contract survived the waiver of payment terms. By the time Plaintiff demanded the full balance on the contract by letter to the Defendant in December 2003, the Defendant had already called on the Plaintiff numerous times to make repairs to the system. The Defendant was not compensating Plaintiff for these visits, as the Defendant testified that he expected that Plaintiff would "stand behind the equipment." Further testimony revealed that the parties had not made any agreements regarding repairs to the system or warranty work. As a result, the parties reached an impasse as the Defendant expected the frequent repairs to the system to be included in the contract price, which was already due and owing, and Plaintiff refused to repair any further defects until the balance was paid in full. The within breach of contract claim and counterclaim followed.
 B. Substantial Performance
With respect to the breach of contract action, the Court must determine "whether [plaintiff] has substantially performed or materially breached its contractual obligations." Women's Development Corp. v. Cityof Central Falls, 764 A.2d 151, 158 (R.I. 2001) (citing National ChainCo. v. Campbell, 487 A.2d 132, 135 (R.I. 1985)). To prevail on his breach of contract claim, Plaintiff must first show that he substantially performed his obligations under the contract.Williston on Contracts, Vol. 15 § 44:52; see also VRT, Inc. v.Dutton-Lainson Co., 530 N.W. 2d 619, 623 (Neb. 1995); Wasserburger v.American Scientific Chemical, Inc., *Page 9 514 P.2d 1097, 1099 (Ore. 1973). "Thus, to establish substantial performance under a contract, any deviation from the contract must be relatively minor and unimportant." Williston on Contracts, Vol. 15 § 44:54. The Court, as fact-finder, must determine whether a party has substantially performed after considering the totality of the evidence, the credibility of the parties' testimony, and the purpose of the contract. See National Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985). Upon a showing of substantial performance, Plaintiff is entitled "to recover the contract price less the amount needed by the party benefiting from that performance to remedy any defects in the work."Butera v. Boucher, 798 A.2d 340, 346 (R.I. 2002).
"[A]s a general rule, there is implied in every contract for work or services a duty to perform it skillfully, carefully, and diligently and in a workman-like manner." Davis v. New England Pest Control Co.,576 A.2d 1240, 1242 (R.I. 1990). Plaintiff agreed to install a POS computer system and provide technical support to the Hi-Hat. The system, which was operating by the end of September 2005, experienced failures within several months. In December 2005, Plaintiff refused to further remedy the problems as more than $8000 remained outstanding on the $38,881 contract.
Frederick Medeiros credibly testified regarding the repair work to the system. Mr. Medeiros testified that he replaced a number of the hard drives and the system hub, and completed other repair work on the system from January through May 2006. He blamed the poor quality of the hardware components for the system failures. Mr. Medeiros also serviced the software system, and urged the Defendant to hire a company specializing in that particular software, POS Technologies, Inc. to make repairs to the software system. Regarding the impact on the business' day to day operations, Mr. Friedlander testified that the problems with the system often slowed down their operations and were a constant nuisance to his employees. The *Page 10 
Defendant admitted, however, that the POS system, though problematic, was never completely replaced, and remains in use today.
Considering the totality of the evidence before it, the Court finds sufficient evidence to conclude that Plaintiff substantially performed on the contract. Accordingly, Plaintiff is entitled to partial recovery, subject to a diminution in value for the defects repaired by the Defendant. As such, both parties have partially prevailed on their claims. Therefore, the Defendant's remaining counterclaims for misrepresentation and unjust enrichment fail and need not be addressed by the Court.
 C. Measure of Damages
Given the unique circumstances of each breach of contract case, the trial justice is given wide latitude to determine damages based on the particular facts in each cause of action. Beverly Hills Concepts v.Schatz Schatz, 717 A.2d 724, 735 (Conn. 1998) "The amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty, and the [prevailing party] must establish reasonably precise figures and cannot rely upon speculation." Nat'lChain Co. v. Campbell, 487 A.2d 132, 134-135 (R.I. 1985).
Regarding Plaintiff's underlying action for breach of contract, the measure of damages is calculated to reflect that Plaintiff substantially performed, albeit with reservations, his part of the agreement. The contract amount totaled approximately $38,000. Plaintiff admits that the Defendant remitted payment totaling $30,500. Plaintiff submits that the Defendant owes him $9416.52 on the unpaid invoices, which includes $1982.16 in finance charge fees.
There is no evidence that the parties' oral agreement encompassed the imposition of finance charges in the event that the Defendant failed to make timely payments. The Court *Page 11 
finds that Plaintiff is not entitled to finance charges that were never agreed upon by the parties. Thus, the balance due on the contract after Defendant's total payments is $7434.36.
Notwithstanding said sum, there were defects in Plaintiff's work. "It is well settled that when a [party] has substantially performed, he can recover the contract price less the amount needed by the owner to remedy the defect." National Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985); Butera v. Boucher, 798 A.2d at 346. The price the Hi-Hat paid to remedy those defects must be deducted from the balance on the contract. Friedlander provided this Court with invoices from all of the repair work conducted on the system from February 2004 to July 2006, totaling $8,347.62 to Ocean State Business Solutions, Inc. and $1,157.50 to POS Technologies, Inc. (total $9,505.12).
With respect to the repair of the alleged defects, Plaintiff argued, however, that a majority of the work done to the system in the two and a half years after its installation constituted routine service calls and system upgrades rather than repair work. Plaintiff asserts that such work is not included in the original contract price, and that the Defendant would have paid for that work regardless of whether Plaintiff himself, or Mr. Medeiros completed the work. On the evidence before it, the Court finds that Plaintiff has not met his burden of demonstrating that the majority of the work was repair work.
Furthermore, the Court finds that Plaintiff frustrated all efforts by the Defendant to mitigate the cost of repairs. In this respect, the Plaintiff cannot satisfy the burden of proving that the Hi-Hat has failed to mitigate the cost of the repair work. Riley v. St.Germain, 723 A.2d 1120, 1123 (R.I. 1999); Bibby's Refrigeration, Heating Air Conditioning, Inc. v. Salisbury, 603 A.2d 726, 729 (R.I. 1992) (the burden of proof falls on the party claiming that *Page 12 
the opposing party failed to mitigate damages). As such, the Plaintiff is not entitled to a reduction in price of the repair work.
In determining damages, the Court notes Plaintiff's actions after his December 2003 demand for payment was not met. Mr. Medeiros testified that with respect to the failed equipment, Plaintiff refused to allow him to access the warranties which were registered in Plaintiff's name. As a result, the Hi-Hat was forced to incur additional and redundant charges to replace equipment which was under warranty. Moreover, Plaintiff's failure to release the administrative access codes for the computer system delayed progress and also resulted in higher repair fees. Particularly troubling to this Court is Plaintiff's own admission that he advised the software company that the Hi-Hat did not pay him for his services. Beyond tarnishing the Hi-Hat's reputation, LaBelle's actions increased expenses when Friedlander was unable to get technical support from the software company. LaBelle's tactics only stymied Friedlander's attempts to mitigate the cost of repairs. Thus, by refusing to service the defects in the system, and by essentially "bad-mouthing" the Defendant to the software company, Plaintiff aggravated what may have been only minor problems.
Finding that Plaintiff failed to mitigate his damages, the Court finds that the Defendant is entitled to the full amount of the repair work. It was conceded in the testimony that the color printer was not a replacement or repair to the original system, but rather an addition which will be deducted from the invoices. The Court is satisfied with Mr. Medeiros' representations to the Court that the remaining items on the itemized invoices were necessary and cost-effective. SeeDeChristofaro v. Machala, 685 A.2d 258, 268 (R.I. 1996). Thus, this Court finds that the actual cost of the repairs totals $9073.06. *Page 13 
The Hi-Hat also requests consequential damages, or "such damages `that do not flow directly and immediately from an injurious act but that result indirectly from the act.'" Riley v. Stafford, 896 A.2d 701, 703
(R.I. 2006) (quoting Black's Law Dictionary 416 (8th ed. 2004)). However, "consequential damages must be `capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the [damages] can be made.'" Goolesby v. Koch Farms, LLC, 955 So. 2d 422, 428 (Ala. 2006) (quoting Med Plus Props. v. Colcock Constr. Group, Inc., 628 So. 2d 370,376-77 (Ala. 1993)). The Court denies Defendant's request for consequential damages, finding that the evidence was too speculative to suggest a concrete loss of profits entitling the Hi-Hat to such damages. Thus, Plaintiff owes Defendant $1638.70.
Additionally, both parties request attorney's fees, costs, and interest. "The court may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court: (1) [f]inds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party." R.I. Gen. Laws § 9-1-45. Finding that both parties' claims were granted in part and denied in part, the Court denies each party's request for attorney's fees, interest, and costs.
 Conclusion
Finding both parties partially prevailed, the Court finds that each party is entitled to damages. Accordingly, judgment shall enter in favor of Plaintiff on his action for breach of contract for $7434.36. Judgment shall enter in favor of Defendant on his counterclaim for breach of contract for $9073.06. Counsel shall prepare an appropriate order for entry.
[1] Malry, L.P. d/b/a the Hi-Hat is the only named defendant in this action. Larry Friedlander was not sued in his individual capacity; however, for purposes of convenience, the facts include his actions as the general partner of the Hi-Hat.